The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: July 14, 2025

**NO. S-1-SC-40141**

**STATE OF NEW MEXICO,**

  Plaintiff-Appellee,

v.

**MARK R. VALENCIA,**

  Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Abigail P. Aragon, District Judge**

Bennett J. Baur, Chief Public Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Van Snow, Acting Deputy Solicitor General
Albuquerque, NM

for Appellee

**OPINION**

**BACON, Justice.**

{1}      This is a capital appeal pursuant to Rule 12-102(A)(1) NMRA wherein Mark Valencia (Defendant) raises four challenges. First, he argues his convictions for two counts of first-degree murder (willful and deliberate), contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and one count of attempt to commit first-degree murder (willful and deliberate), contrary to NMSA 1978, Sections 30-28-1 (1963, amended 2024) and 30-2-1(A)(1), must be reversed because the district court denied his requested inability-to-form-intent (voluntary intoxication) jury instructions. We hold Defendant was not entitled to his requested instructions because his proffered instructions misstated the law, and thus affirm. Second, Defendant argues his convictions for aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963), and attempt to commit first-degree murder violated double jeopardy. We hold double jeopardy was not violated, and affirm. Third, Defendant argues his convictions for shooting at a dwelling or occupied building, contrary to NMSA 1978, Section 30-3-8(A) (1993), and negligent use of a deadly weapon, contrary to NMSA 1978, Section 30-7-4(A)(2) (1993), violated double jeopardy. We again hold double jeopardy was not violated, and affirm. Fourth, Defendant argues the district court lacked statutory authority to increase his basic

sentence for attempt to commit first-degree murder with a three-year firearm enhancement. We disagree, and affirm. We remand this case to the district court solely to amend Defendant's 365-day sentence for negligent use of a deadly weapon, a petty misdemeanor that may not carry a sentence of more than six months pursuant to NMSA 1978, Section 31-19-1(B) (1984).

## I.      BACKGROUND

**A.      Facts**

{2}      During the evening of December 11, 2021, Defendant and his girlfriend, murder-victim Eva Aragon (Aragon), went to hang out with Aragon's uncle, David Sturgeon (Sturgeon), at Sturgeon's house in Pecos, New Mexico. Sturgeon and his friend, murder-victim Steven Singer (Singer), were at the house drinking beers before Defendant and Aragon arrived. Defendant and Aragon had also been drinking prior to meeting up with Sturgeon and Singer.

{3}      Once at the house, Defendant, Aragon, and Singer took shots of vodka, and progressed to simply passing around the bottle. They finished one bottle and started sharing a second. Around seven or eight o'clock, Singer gave Defendant a haircut, which started an argument because Defendant was not happy with the result. Singer and Defendant argued and pushed each other, and Defendant then retrieved a gun from his vehicle. While Defendant was retrieving the gun, Sturgeon closed and

locked the front door of the house. Defendant shot at the front door at least eight times, eventually shot the lock, and opened the door.

{4}     Singer and Aragon were standing just inside the door. Defendant shot Singer in the head just below the left nostril, killing him. Aragon got down on the floor next to Singer, and Defendant then shot Aragon between the eyes, killing her as well.

{5}     Defendant pointed the gun at Sturgeon and said he would shoot him, too. Sturgeon hid in a closet and called 911. Defendant walked around the house, and repeatedly said he was going to find and shoot Sturgeon. Defendant "shot the whole house up," with one bullet going into the closet where Sturgeon was hiding.

{6}     Police were dispatched around 9:26 p.m. and arrived at the scene within fifteen minutes. The scene was quiet when they arrived. They checked each vehicle in front of the house for people, finding Defendant slumped over the steering wheel in the driver's seat of Sturgeon's van. Defendant was not moving, so the police did not know whether he was deceased or asleep. He had an unlit cigar or cigarette in his hand, smelled of alcohol, and was not wearing shoes. Police woke Defendant, but it took a while to get his attention. Defendant was put in a patrol car without incident. While in the patrol car, he repeatedly hung his head and mumbled incoherently to himself.

{7} At approximately 2:00 a.m., agents questioned Defendant about what happened. The agents noticed Defendant had slow speech, as well as bloodshot and watery eyes. Defendant confessed to the shootings. He claimed he shot Singer because Singer started "coming at him," and he shot Aragon because she got in the way. Defendant denied threatening Sturgeon and also said he did not remember firing any shots after shooting Singer. Also, he told the agents he had a lot to drink—half a fifth of vodka and two beers. Defendant was subsequently charged with, inter alia, the murders of both Singer and Aragon. Additional facts will be provided in the analysis sections below as relevant.

**B.     Procedural History**

{8} In August 2023, Defendant was tried by a jury on two counts of first-degree murder (willful and deliberate), attempt to commit first-degree murder (willful and deliberate), aggravated assault with a deadly weapon, shooting at a dwelling or occupied building, and negligent use of a deadly weapon. Defendant's theory of the case with regards to both counts of first-degree murder and attempt to commit first-degree murder was that he was too intoxicated to form the requisite mental state—deliberate intention—required to commit the offenses. He requested a voluntary intoxication jury instruction pursuant to UJI 14-5110 NMRA for both charges of first-degree murder, and a like instruction pursuant to UJI 14-5111 NMRA for the

4

charge of attempt to commit first-degree murder. The district court denied his request, reasoning the instructions were not supported by the evidence. Defendant was found guilty on all charges. The jury also found he "used" a firearm in the commission of the first-degree murder of Aragon, the attempted first-degree murder of Sturgeon, and the aggravated assault against Sturgeon, as well as while shooting at a dwelling or occupied building.

{9}     The district court imposed a sentence of life without possibility of parole for each of the first-degree murder convictions; a nine-year basic sentence for the attempt to commit first-degree murder conviction; and an eighteen-month sentence for the shooting at a dwelling or occupied building conviction. The district court ran all of those sentences consecutively. Pursuant to NMSA 1978, Section 31-18-16 (2020, amended 2022), the district court enhanced Defendant's attempt to commit first-degree murder conviction with a three-year firearm enhancement, also run consecutively; the district court did not enhance any of Defendant's other convictions.[1] Finally, the district court sentenced Defendant to serve eighteen months for aggravated assault with a deadly weapon and 365 days for negligent use

---

[1]The firearm enhancement in Section 31-18-16 only applies to noncapital felonies. Therefore, it was inconsequential for the jury to pass on whether Defendant used a firearm in the commission of first-degree murder.

of a deadly weapon. These two sentences were to be served concurrently with other sentences.

{10} Defendant timely appealed his convictions directly to this Court pursuant to Rule 12-102(A)(1), and raises the following issues:

(1) whether the district court erred by denying Defendant's voluntary intoxication jury instruction as it pertained to the charges of first-degree murder (willful and deliberate) and attempt to commit first-degree murder (willful and deliberate);

(2) whether his convictions for attempted murder and aggravated assault violated double jeopardy;

(3) whether his convictions for shooting at a dwelling or occupied building and negligent use of a deadly weapon violated double jeopardy;

(4) whether the firearm enhancement was unlawful because "using" a firearm in the commission of a noncapital felony was not, on the date of the offense, enhanceable conduct under Section 31-18-16 (2020).

## II. DISCUSSION

{11} We begin by addressing whether Defendant was improperly denied his requested voluntary intoxication jury instructions. We conclude denial was not improper because Defendant's proffered instructions misstated the law. Consequently, we affirm Defendant's convictions for first-degree murder and attempt to commit first-degree murder. Next, we address Defendant's first double jeopardy challenge, holding his convictions for attempt to commit first-degree

6

murder and aggravated assault did not violate double jeopardy. Then, we address Defendant's second double jeopardy challenge, holding his convictions for shooting at a dwelling or occupied building and negligent use of a deadly weapon did not violate double jeopardy. Last, we address Defendant's argument that the firearm enhancement constituted an unlawful sentence, holding that even though the enhancement was in error, the error was not fundamental.

**A.      Voluntary Intoxication Jury Instructions**

**1.      Standard of review**

{12}      There are two standards we employ to determine the outcome of this issue. First, the standard of appellate review: "[t]he propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747 (internal quotation marks and citation omitted). Second, because there is no dispute the issue was preserved, as Defendant timely requested the instructions, argued for them during trial, and cited proper authority, we review for reversible error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

**2.      Analysis**

{13}      For the charges of first-degree murder, the jury had to find Defendant acted with a specific "deliberate intention" to take away the lives of Singer and Aragon;

7

for attempt to commit first-degree murder, the jury had to find Defendant acted with the specific intent to commit the crime of first-degree murder, which in turn required Defendant to have a deliberate intention to take away the life of Sturgeon. The jury was given the following instruction pursuant to UJI 14-201 NMRA for both charges of first-degree murder and the charge of attempt to commit first-degree murder:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

{14} Defendant's sole defense at trial was that his intoxication impaired his ability to form the deliberate intent required to be convicted of either first-degree murder or attempt to commit first-degree murder. "The defense of inability to form specific intent allows a defendant to avoid culpability for willful and deliberate murder whenever he or she was unable to form the specific intent required to commit the crime." *State v. Boyett*, 2008-NMSC-030, ¶ 27, 144 N.M. 184, 185 P.3d 355; *see also State v. Brown*, 1996-NMSC-073, ¶ 22, 122 N.M. 724, 931 P.2d 69 (defining a "specific-intent crime" as a crime "for which a statute expressly requires proof of intent to do a further action or achieve a further consequence," while defining a

8

general intent crime as one only requiring a "conscious wrongdoing" (internal quotation marks and citations omitted)). The defense "applies in two situations: (1) when the defendant was intoxicated from the use of alcohol or drugs and (2) when the defendant suffered from a mental disease or disorder." *Boyett*, 2008-NMSC-030, ¶ 27. Only the former is at issue in this case, informing the requested instructions for first-degree murder and attempt to commit first-degree murder.

{15} To be entitled to a voluntary intoxication jury instruction, "the defendant must present evidence that (1) he or she consumed intoxicants, (2) he or she was actually intoxicated, and (3) the degree of intoxication interfered with his or her ability to develop the requisite intent to commit the charged crime." *State v. Arrendondo*, 2012-NMSC-013, ¶ 43, 278 P.3d 517. "In deciding whether the instruction is proper, the trial court must not weigh the evidence, but must simply determine whether such evidence exists." *State v. Privett*, 1986-NMSC-025, ¶ 20, 104 N.M. 79, 717 P.2d 55. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *Boyett*, 2008-NMSC-030, ¶ 12 (text only) (citation omitted).[2]

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

{16} Looking at the *Arrendondo* elements, the district court found there was evidence to establish Defendant had consumed intoxicants and was actually intoxicated. However, the district court found the evidence did not support the third *Arrendondo* element regarding whether the degree of intoxication interfered with Defendant's ability to form the requisite intent. We disagree.

**a.** **The district court improperly weighed the evidence and failed to consider the evidence in the light most favorable to giving the requested instructions**

{17} Prior to arriving at its conclusion that the evidence did not support the third *Arrendondo* element, the district court articulated for the record the evidence it was considering. Before listing the evidence, the district court stated, "the court is not weighing the evidence, but the court must note the evidence." The district court then proceeded to weigh the evidence by pitting facts tending to prove the third *Arrendondo* element against facts tending to disprove the element:

> The evidence before the [district] court is that there was vodka consumed. It was shared by Mr. Singer, Ms. Aragon, and by [Defendant]. There was some verbal, perhaps, altercation. At that time, [Defendant] left the home on his own power. He entered his vehicle on his own power. He located his weapon—the 9mm weapon, and he obtained the weapon and the magazine. Although the court has no evidence before it as to whether the weapon was already loaded or not, clearly it had the magazine. He walked back to the home on his own power. He shot the door approximately, I believe, eight to fifteen times until the lock was broken on the door. He then entered the home—again, there is no evidence of stumbling—and shot Mr. Singer. He then shot Ms. Aragon. . . . Defendant then walked back to his own vehicle

10

and placed the weapon in his own vehicle. He then entered the van belonging to Mr. Sturgeon on his own power. Upon arrest—although there is evidence that his head was slumped over, and they did not know whether he was dead or alive—he was able to crawl across the console of the van on his own power. There was no evidence that he stumbled. He was then placed in handcuffs. He walked on his own power to the patrol vehicle. The evidence also shows that he carried on a conversation with the patrol officer, almost immediate in time, including a discussion of football teams. Specifically, it shows his ability to articulate [his thoughts on] the [Dallas] Cowboys. There is also no evidence that he vomited, which . . . might indicate extreme intoxication.

Weighing evidence occurs when a court considers the degree to which evidence proves or disproves a fact. This includes any determination about the persuasiveness of the evidence when compared to the persuasiveness of other evidence. *Weight of the evidence*, *Black's Law Dictionary* (12th ed. 2024) (defining "weight of the evidence" as "[t]he persuasiveness of some evidence in comparison with other evidence"). The district court's focus on Defendant's ability to move about "on his own power," to make intelligent choices such as retrieving and then returning his gun to his vehicle, his ability to "crawl" over the van's console, and his ability to converse with police reveals the district court was weighing the evidence by comparing evidence pro and con on the issue of whether Defendant's degree of intoxication interfered with his ability to form the requisite intent.

{18}     By weighing the evidence in this manner, the district court also failed to view the evidence in the light most favorable to giving the instruction. To view evidence

in the light most favorable to a certain outcome means a court must indulge all reasonable inferences *and resolve all conflicts in the evidence* in favor of the outcome. *See State v. Kersey*, 1995-NMSC-054, ¶ 11, 120 N.M. 517, 903 P.2d 828; *Light most favorable*, *Black's Law Dictionary* (12th ed. 2024) (defining "light most favorable" as "[t]he standard of scrutinizing or interpreting a verdict by accepting as true all evidence and inferences that support it and disregarding all contrary evidence and inferences"). Applied here, the district court should not have considered facts tending to prove sobriety, such as Defendant's ability to move "on his own power" and converse with police. Rather, the district court should have only considered evidence tending to prove intoxication.

**b.      Evidence was presented showing that Defendant's degree of intoxication interfered with his ability to form a deliberate intent to kill**

{19} The trial record contained the following evidence relevant to the issue of whether the degree of Defendant's intoxication interfered with his ability to form a deliberate intent:

> (1)   Defendant had already been drinking before arriving at Sturgeon's house;
>
> (2)   After arriving at Sturgeon's home, Defendant drank beer and vodka;
>
> (3)   Defendant took shots of vodka;

12

(4) After taking shots, Defendant and two others consumed the vodka by passing around the bottle;

(5) Defendant and two others finished one bottle (a fifth, i.e., approximately 750 ml);

(6) Defendant and two others passed around a second bottle;

(7) Defendant was drunk by the time the second bottle was opened;

(8) Defendant appeared to be as intoxicated as Aragon who, when tested post-mortem, had a blood-alcohol level of .292;

(9) Defendant was found by police slumped over the steering wheel of Sturgeon's van with an unlit cigar or cigarette and no shoes;

(10) When an officer looked into the van and found Defendant, she could not tell if Defendant was deceased or asleep;

(11) It took "some time" for Defendant to comprehend that police were waking him up after he fell asleep in the van;

(12) While in the back of the patrol car, Defendant had his head down and was mumbling to himself;

(13) Defendant told officers he had drank "a lot . . . half a fifth of vodka and probably two beers" over the course of three to four hours;

(14) Defendant did not remember firing any other shots or remember anything after shooting Singer.

{20} Viewing this evidence in the light most favorable to giving the instruction, and refraining from weighing this evidence against countervailing evidence of sobriety, these facts could have supported a conclusion that Defendant was

13

intoxicated to a degree that interfered with his ability to form a deliberate intent to kill. To begin, the evidence showed the quantity of alcohol consumed was significant: at least half a bottle of vodka and two beers. This is relevant because a juror could logically reason the more alcohol Defendant consumed, the more intoxicated he would be, and a higher degree of intoxication increases the potential the intoxication interfered with Defendant's ability to deliberate. Further, testimony revealed Defendant was intoxicated to the same degree as Aragon, whose post-mortem BAC was .292. True, it would be speculation to conclude Defendant's BAC was at a similar level because his level was not documented, but the importance of this fact is that Defendant *appeared* like someone with a .292 BAC.

{21} Next, Defendant was found inside Sturgeon's van, slumped over the steering wheel, unshod, holding an unlit cigar or cigarette. Defendant did not leave the scene, which could lead a reasonable juror to conclude his mental faculties were seriously impaired. After all, reason and experience inform us that culpable people *leave* crime scenes, not that they sleep at them. *See, e.g.*, *State v. Trujillo*, 1981-NMSC-023, ¶ 31, 95 N.M. 535, 624 P.2d 44 (holding that evidence of flight after a crime is committed is admissible to prove consciousness of guilt). Being slumped over the wheel could indicate to a reasonable juror that Defendant was intoxicated to the degree he was able to fall asleep in what could be seen as an extremely

14

uncomfortable position. Additionally, because he was "slumped over the wheel," a reasonable mind could conclude Defendant did not purposefully put himself in that position to go to sleep, but rather passed out as a result of his intoxicated state. Passing out, or falling asleep unwilfully, could reasonably correlate with a heightened degree of intoxication and a seriously impaired mind. The unlit cigarette could further support this theory because Defendant presumably would not hold a cigarette just to go to sleep with it in his hand. Rather, a reasonable inference could be that he removed a cigarette from its pack but passed out before he could light it. Lastly, the fact Defendant was not wearing shoes could be reasonably interpreted as his inability to think cogently or plan effectively because, typically, people put on shoes when they leave the house, especially if they enter a vehicle intending to drive. Lastly, Defendant said he "did not remember firing any other shots or remember anything after shooting [Singer]." If believed, this could mean that Defendant was intoxicated to such a degree that he could not remember anything after killing Singer, which would mean he did not even remember killing Aragon. A logical inference could be that at the time of the killings he was so intoxicated that he later had no memory of major aspects of the events.

{22}	In arriving at the conclusion that evidence showed the degree of intoxication interfered with Defendant's ability to form a deliberate intent, we acknowledge there

15

was significant evidence of sobriety. For example, Defendant told officers he "thought about [going home]" but returned to the trailer with his gun because he did not want to leave Aragon there. Also, as the district court acknowledged, he moved about on his own power and was cogent enough to retrieve the firearm from his vehicle and converse with police. Further, there was not only evidence of sobriety but contradictory statements by Defendant that could readily cause any factfinder to discredit his theory of the case. For example, Defendant said he did not remember anything after shooting Singer, which would mean he did not remember shooting Aragon, but also said he only shot Aragon because she "got in the way." Clearly, these two versions of the facts cannot coexist. However, all the evidence of sobriety, along with evidence cutting against Defendant's credibility, should not have been considered by the district court because evidence must not be weighed and must be viewed in the light most favorable to giving the instruction.

{23} Applying these principles, evidence supported giving Defendant's requested voluntary intoxication instructions.

**3.    Quantum of proof**

{24} We take this opportunity to clarify the quantum of evidence necessary to warrant the grant of an instruction under *Arrendondo*. The three-part test from *Arrendondo* does not state the quantum of evidence required to prove each element,

16

but rather only requires the defendant to "present evidence" supporting each element. 2012-NMSC-013, ¶ 43. Without a descriptor, "evidence" suggests an any-evidence standard. This is improper, and warrants clarification.

{25} To determine the requisite quantum of evidence required to support giving a voluntary intoxication instruction, it is helpful to recognize the category of defenses into which voluntary intoxication falls. *See* 1 Paul H. Robinson, *Criminal Law Defenses* § 21 (June 2025 Update) (defining five categories of defenses: failure of proof, offense modification, justifications, excuses, and nonexculpatory). Voluntary intoxication is properly categorized as a failure of proof defense because intoxication negates an element of the charge, namely, the intent element. *Brown*, 1996-NMSC-073, ¶ 21 ("Like mistake and mental illness, a state of intoxication may also negate a required offense element, and when raised in this context, is a failure of proof defense." (internal quotation marks and citation omitted)).

{26} With a failure of proof defense, a defendant has no burden to produce evidence because the burden of production is constitutionally on the prosecution to introduce sufficient evidence supporting each element of the crime. *See In re Winship*, 397 U.S. 358, 364 (1970) ("Due process commands that no [person] shall lose [their] liberty unless the Government has borne the burden of convincing the factfinder of [their] guilt." (text only) (citation omitted)); *but see Patterson v. New York*, 432 U.S.

17

197, 205-07 (1977) (holding it was not unconstitutional to place the burden of production on the defendant to prove the affirmative defense of "extreme emotional disturbance" by preponderance of the evidence when extreme emotional disturbance did not negate an element of the charged crime). However, the prosecution is not required to prove any crime beyond all possible doubt, only beyond reasonable doubt. UJI 14-5060 NMRA. Consequently, if a defendant seeks to negate an element of an offense based on a particular theory of the case, a defendant may have to present evidence to support that theory if supporting evidence has not been revealed during the prosecution's case-in-chief. Otherwise, any argument in support of a defendant's theory—and any acceptance of the theory by the trier of fact—would require speculation. This limited burden of production does not upset the constitutional requirement that the prosecution prove each element beyond a reasonable doubt, but rather reflects the tenet of evidence law and trial practice that litigants may only argue—and jurors must only consider—evidenced facts and reasonable inferences therefrom. *See* UJI 14-6006 NMRA (instructing the jury that "[y]our verdict should not be based on speculation, guess or conjecture").

{27}     Just as a defendant must point to evidence supporting their theory of the case if they intend to argue that theory to the trier of fact, a defendant also must point to evidence in order to warrant a jury instruction on their theory. 1 Robinson, *supra*, §

18

4(a)(2) (explaining that "[t]he defendant may have to bear a burden of production if he seeks to inject a particular theory for or seeks an instruction suggesting a particular theory for the absence of the required element, such as a special instruction on mental illness negating an element"). And so, there must be some amount of evidence presented during trial in support of a defendant's theory of the case in order to warrant a jury instruction on that theory—but how much? For voluntary intoxication instructions, our precedent prior to *Arrendondo* varied in articulating the requisite amount of evidence. *See, e.g.*, *State v. Williams*, 1966-NMSC-145, ¶ 28, 76 N.M. 578, 417 P.2d 62 ("[T]he evidence as to intoxication must be substantial."); *Privett*, 1986-NMSC-025, ¶ 20 ("[T]he record must contain some evidence showing or tending to show that defendant [was intoxicated]."); *State v. Begay*, 1998-NMSC-029, ¶ 38, 125 N.M. 541, 964 P.2d 102 ("Where the record contains evidence which reasonably tends to show that defendant's claimed intoxication rendered him incapable of acting in a purposeful way, an instruction . . . is warranted." (internal quotation marks and citation omitted)); *State v. Garcia*, 2011-NMSC-003, ¶ 35, 149 N.M. 185, 246 P.3d 1057 ("[T]here must be evidence supporting the conclusion that the defendant was actually intoxicated.").

{28}   Looking outside our voluntary intoxication jurisprudence, precedent involving when defendants are entitled to a jury instruction on other failure of proof

19

defenses reveals a common standard. Regarding a defendant's requested self-defense instruction, this Court has held we must "'determine whether there is sufficient evidence to raise a reasonable doubt about self-defense.'" *State v. Baroz*, 2017-NMSC-030, ¶ 13, 404 P.3d 769 (quoting *State v. Gaines*, 2001-NMSC-036, ¶ 4, 131 N.M. 347, 36 P.3d 438). Regarding a defendant's lawfulness instruction for a battery charge, this Court has applied the same standard, holding that to warrant a lawfulness instruction for battery, there must be "'sufficient evidence to raise a reasonable doubt about [the unlawfulness of [the] [d]efendant's conduct].'" *State v. Smith*, 2021-NMSC-025, ¶ 12, 491 P.3d 748 (first and sixth brackets in original) (quoting *Gaines*, 2001-NMSC-036, ¶ 4).

{29} In accordance with *Baroz* and *Smith*, we conclude a defendant seeking a jury instruction on voluntary intoxication must point to evidence in the trial record sufficient to raise a reasonable doubt about whether they were—as a result of their intoxicated state—capable of forming the requisite intent. This is synonymous with saying the evidence must be sufficient for a reasonable juror to find in favor of a defendant's theory of the case. *See Gaines*, 2001-NMSC-036, ¶ 6 ("'As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.'" (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988))). Applied to the

20

*Arrendondo* elements individually, a district court should engage in an inquiry to determine whether sufficient evidence has been presented so that a reasonable juror could find the defendant (1) consumed alcohol, (2) was actually intoxicated, and (3) the degree of intoxication interfered with the defendant's ability to form the requisite intent. If each element is supported by enough evidence so that a reasonable juror could find each element to be true—that is, *sufficient* evidence—then a juror could reasonably find the defendant's theory of the case to be true and, consequently, could have reasonable doubt about whether the defendant was capable of forming the requisite intent.

{30} When determining how much evidence is sufficient to raise a reasonable doubt—or sufficient to find in favor of a defendant's theory of the case—differences of opinion have attended the question whether "slight" or "any" evidence is enough. *Baroz* and *Smith* reveal these differences. In *Baroz*, this Court concluded "[w]here the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind on whether a defendant . . . [acted] in self-defense, the instruction should not be given." 2017-NMSC-030, ¶ 19 (internal quotation marks and citation omitted). In *Smith*, however, this Court went on to explain that evidence is sufficient to warrant "[a]n instruction on the essential element of unlawfulness . . . if there is *any evidence, even slight evidence*, supporting a defendant's corresponding theory of the case."

21

2021-NMSC-025, ¶ 12 (emphasis added) (brackets, internal quotation marks, and citation omitted).

{31} We clarify that *slight* or *any* evidence supporting a defendant's theory of the case does not necessarily mean the evidence qualifies as *sufficient* to raise a reasonable doubt. The reason for this is that doubt should be *reasonable*. Doubt based on speculation or mere remote possibilities drawn from a scant amount of evidence would be *unreasonable*. True, the question of whether a reasonable doubt exists will always be a matter solely within the province of the jury—but whether to instruct on a particular theory is the province of a court, and a court is under no obligation to give a defendant's requested instruction on a particular theory of the case when a finding in favor of that theory could only be based on speculation.

{32} In sum, when determining whether to give a voluntary intoxication instruction, a court should determine whether there is sufficient evidence in the record to raise a reasonable doubt about whether a defendant was—as a result of their intoxicated state—capable of forming the requisite intent. In answering this question, a court must determine if the evidence could lead a reasonable juror to believe the defendant (1) consumed alcohol, (2) was actually intoxicated, and (3) the degree of intoxication interfered with his or her ability to form the requisite intent. *Any* evidence is not necessarily sufficient evidence, and if necessary conclusions

22

could only be drawn by buttressing the evidenced facts with surmise and conjecture, the instruction should not be given. *Cf. State v. Tovar*, 1982-NMSC-119, ¶ 8, 98 N.M. 655, 651 P.2d 1299 (stating in the context of sufficiency review, "[a] conviction cannot stand if the evidence must be buttressed by surmise and conjecture, rather than logical inference in order to support the conviction" (text only)).

**4.      The district court's denial of Defendant's proposed voluntary intoxication jury instructions is not reversible error**

{33}     "When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error." *Brown*, 1996-NMSC-073, ¶ 34. However, "[a] trial court's refusal to submit a jury instruction is not error if the submission of the instruction would mislead the jury by promoting a misstatement of the law." *State v. Nieto*, 2000-NMSC-031, ¶ 17, 129 N.M. 688, 12 P.3d 442; *State v. Salazar*, 1997-NMSC-044, ¶ 57, 123 N.M. 778, 945 P.2d 996 ("It is not error for a trial court to refuse instructions which are inaccurate."); *State v. Casteneda*, 1982-NMCA-046, ¶ 33, 97 N.M. 670, 642 P.2d 1129 ("In order to premise error on the refusal of the trial court to instruct, the defendant must tender a legally correct statement of law."). In this case, Defendant's proposed voluntary intoxication instructions misstated the law by omitting language required by the

relevant uniform jury instructions. We recognize that these omissions were highly favorable to Defendant.

{34} First, for both charges of first-degree murder, Defendant requested the following jury instruction based on UJI 14-5110:

> An issue you must consider in this case is whether the defendant was intoxicated from [the] use of alcohol. You must determine whether or not the defendant was intoxicated from the use of alcohol and if so, what effect this had on the defendant's ability to form the deliberate intent to take away the lives of others.
>
> The burden is on the state to prove beyond a reasonable doubt that the defendant was capable of forming a deliberate intention to take the lives of others.
>
> If you have a reasonable doubt as to whether the defendant was capable of forming a deliberate intent to take away the lives of others, you must find the defendant not guilty of a first-degree murder by deliberate killing.

Importantly, UJI 14-5110 includes the following use note:

> If this instruction is given, add to the essential elements instruction for the offense charged, "The defendant was not intoxicated from use of alcohol . . . at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another.

*Id.* use note 1 (brackets and parentheses omitted). In his proposed instruction to the district court, Defendant added the following element to the essential elements instruction for both charges of first-degree murder: "The defendant was not intoxicated from use of alcohol." Clearly, Defendant's requested

24

instruction omitted the requirement that the jury find—beyond a reasonable doubt—that he was not intoxicated *to the extent of being incapable of forming an intent to take away the life of another*. His proposed instruction would have required the jury to acquit on both first-degree murder charges simply if they had a reasonable doubt whether he was sober. This would have constituted a blatantly erroneous legal standard, and the judge was therefore under no obligation to give Defendant's proposed instruction even though it was supported by sufficient evidence.

{35}     Second, Defendant requested the following instruction based on UJI 14-5111 for the charge of attempt to commit first-degree murder:

> An issue you must consider in this case is whether the defendant was intoxicated from the use of alcohol. You must determine whether or not the defendant was intoxicated from the use of alcohol and, if so, what effect this had on the defendant's ability to form the intent to attempt to commit the crime of first[-]degree murder (willful or deliberate).

> Intent to attempt to commit the crime of first[-]degree murder (willful or deliberate) is not an element of the crime of first[-]degree murder (willful and deliberate).

> The burden is on the state to prove beyond a reasonable doubt that the defendant was capable of forming an intention to attempt to commit the crime of first[-]degree murder (willful or deliberate). If you have a reasonable doubt as to whether the defendant was capable of forming such an intention, you must find the defendant not guilty of attempt to commit the crime of first[-]degree murder (willful or deliberate).

Critically, and like UJI 14-5110, UJI 14-5111 contains the following Use Note:

25

> If this instruction is given, add to the essential elements instruction for the offense charged, "The defendant was not intoxicated from use of alcohol . . . at the time the offense was committed to the extent of being incapable of forming an intention to [commit first-degree murder]."

UJI 14-5111 use note 1 (brackets and parentheses omitted). However, in his proposed instruction to the district court, Defendant added the following element to the essential elements instruction for attempt to commit first-degree murder: "The defendant was not intoxicated from use of alcohol." Like the added element for the first-degree murder charges, Defendant omitted the requirement that the jury find—beyond a reasonable doubt—that he was not intoxicated *to the extent of being incapable of forming an intention to commit first-degree murder*. And again, Defendant's proposed instruction would have required the jury to acquit on the attempt to commit first-degree murder charge simply if they had a reasonable doubt whether he was sober. This would have been an erroneous standard, and Defendant's proposed instruction should not have been presented to the jury even though it was supported by sufficient evidence.

{36}    In sum, the district court's denial of Defendant's voluntary intoxication instructions is not reversible error because Defendant did not propose accurate instructions to the court. The instructions were not just inaccurate—they were blatant misstatements of the law highly favorable to Defendant. Accordingly, we affirm

Defendant's convictions for first-degree murder and attempt to commit first-degree murder.

**B.      Double Jeopardy**

{37}    Defendant contends his convictions for attempt to commit first-degree murder and aggravated assault violated double jeopardy, and also claims his convictions for shooting at a dwelling or occupied building and negligent use of a deadly weapon violated double jeopardy. We conclude double jeopardy was not violated and affirm all four convictions.

**1.      Standard of review**

{38}    "A double jeopardy challenge presents a question of constitutional law, which we review de novo." *State v. Torres*, 2018-NMSC-013, ¶ 17, 413 P.3d 467.

**2.      Analysis**

{39}    Under the United States and New Mexico Constitutions, no person shall be "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. "The double jeopardy clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Begaye*, 2023-NMSC-015, ¶ 12, 533 P.3d 1057 (internal quotation marks and citation omitted). "[M]ultiple punishment cases [come to this Court] in two ways."

*Id.* "First, there are double description cases in which a single act results in multiple charges under different criminal statutes. Second, there are unit of prosecution cases in which an individual is convicted of multiple violations of the same criminal statute." *Id.* (text only) (citation omitted). Here, both double jeopardy issues present double-description cases because Defendant argues he was convicted multiple times under different criminal statutes for the same act.

{40} When faced with a double-description challenge, we follow the two-part test adopted in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. *Begaye*, 2023-NMSC-015, ¶ 13. "First, we assess whether the conduct underlying the offenses is unitary, that is, whether the same conduct violates both statutes. Second, we examine the statutes at issue to determine whether the legislature intended to create separately punishable offenses." *Id.* (text only) (quoting *Swafford*, 1991-NMSC-043, ¶ 25). Only if the conduct is unitary and the legislature did not intend to create separately punishable offenses will the double jeopardy clause prohibit multiple punishment in the same trial. *Id.*

a. **Unitary conduct overview**

{41} To determine whether the conduct was unitary, we ask whether the conduct underlying both convictions is sufficiently distinct as to time, place, or action. *Id.* ¶ 14. "The conduct question depends to a large degree on the elements of the charged

28

offenses and the facts presented at trial." *Id.* ¶ 20 (internal quotation marks and citation omitted). To determine the elements of the charged offenses, we look to the jury instructions presented at trial. *Cf. State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (stating that when a reviewing court determines whether sufficient evidence supports each element of a charged offense, "the jury instructions become the law of the case" (text only) (citation omitted)). When the legal theory is still unclear based on the elements of the charged offenses and facts presented at trial, we may also review opening statements and closing arguments to establish whether the same evidence supported a defendant's convictions under both statutes. *Begaye*, 2023-NMSC-015, ¶ 18. For both double jeopardy issues, we conclude the conduct was not unitary. We address each in turn.

**b.     The conduct underlying Defendant's convictions for aggravated assault and attempt to commit first-degree murder was not unitary**

{42}    For the first double jeopardy issue, Defendant argues, and the State concedes, the conduct constituting both aggravated assault and attempt to commit first-degree murder was unitary. We disagree.

{43}    For the charge of aggravated assault, the prosecution pursued an "attempted battery" theory. Under this theory, and according to the jury instructions, the jury had to find Defendant "intended to commit the crime of battery against David Sturgeon by shooting him," and "began to do an act which constituted a substantial

29

part of the battery but failed to commit the battery." "Substantial part" was not further defined by the jury instructions, but in closing argument the prosecutor said the aggravated assault was when "[Defendant] pointed the gun at [Sturgeon]."[3] For attempted murder, the jury had to find that, with the intent to commit first-degree murder against Sturgeon, Defendant "began to do an act which constituted a substantial part" of the crime but failed to complete it. "Substantial part" was not further defined by the jury instructions, but in closing arguments the prosecutor said, "the attempted murder is when [Defendant] starts putting the bullets in the walls and he's searching for [Sturgeon]." So, according to the prosecution's closing argument, the conduct constituting aggravated assault was Defendant pointing the gun at Sturgeon, and the conduct constituting attempted murder was when Defendant started (1) putting bullets in the walls and (2) searching for Sturgeon.

{44} In his briefing, Defendant recognized the prosecutor said in closing argument that the aggravated assault was when Defendant pointed the gun at Sturgeon. Defendant contends, however, this theory of aggravated assault was "belied by the

---

[3]In his closing, the prosecutor appeared to conflate an "attempted battery" theory of assault with a "menacing conduct" theory by explaining to the jury that the aggravated assault was when Defendant "pointed the gun at Mr. Sturgeon, [and] Mr. Sturgeon was fearful—he goes to hide." Under an attempted battery theory, Sturgeon's belief about whether he was in danger of receiving an immediate battery is irrelevant.

jury instruction which required shooting at [Sturgeon]." The State agreed in its briefing, and said, "the same conduct of shooting at Sturgeon but missing formed the factual basis for both crimes."

{45} Upon our own review of the record, the jury instruction on aggravated assault did not contradict the theory that pointing the gun at Sturgeon constituted the aggravated assault. Defendant claims the jury instruction for aggravated assault required a finding Defendant "shot at" Sturgeon. However, the jury instruction did not require shooting at Sturgeon. Rather, it only required the jury to find Defendant "intended to commit the crime of battery against David Sturgeon *by shooting him*." Defendant misreads the jury instruction as requiring a finding of actual shooting, but it only requires an intent to shoot. Then, the instruction requires an act constituting a "substantial part" of the battery. Per the prosecutor's closing argument, the aggravated assault occurred when Defendant pointed the gun at Sturgeon. The prosecutor did not label this act a "substantial part" of the battery, but when taken in conjunction with the jury instruction, it was the only possible act that could have constituted the "substantial part."

{46} So, the question for this Court is whether pointing the loaded gun at Sturgeon (aggravated assault) and putting bullets in the walls and searching for Sturgeon (attempt to commit first-degree murder) constituted unitary conduct. We conclude

that in this case, no, pointing a gun at Sturgeon and then putting bullets in the walls and searching for Sturgeon were not unitary conduct because they were sufficiently distinct actions that occurred sequentially. Because the conduct was not unitary, we need not analyze whether the legislature intended multiple punishments. Double jeopardy was not violated, and we affirm Defendant's convictions for aggravated assault and attempt to commit first-degree murder.

**c.     The conduct underlying Defendant's convictions for shooting at a dwelling or occupied building and negligent use of a deadly weapon was not unitary**

{47}     Defendant argues the conduct underlying both shooting at a dwelling or occupied building and negligent use of a deadly weapon was unitary "because [he] was carrying a firearm while intoxicated when he shot at a dwelling or occupied building." The State counters that the conduct was not unitary because "carrying a gun without discharging it while drunk is different from shooting at a home knowing that there are people inside." We agree with the State that the conduct was not unitary. In arriving at this conclusion, we underscore *Begaye*'s direction that the conduct question depends to a large degree on the elements of the charged offenses and the facts presented at trial.

{48}     According to the jury instructions, for the charge of shooting at a dwelling or occupied building, the prosecution had to prove Defendant (1) willfully shot at a

32

dwelling or occupied building, and (2) knew the building was a dwelling or occupied. For negligent use of a deadly weapon, the prosecution had to prove Defendant carried a firearm while under the influence of alcohol. While the elements for each charge both involve a firearm, they are otherwise distinct.

{49}    Additionally, by the facts of the case, Defendant's "negligent use of a firearm" was complete the moment he grabbed the firearm out of the car, but he only completed shooting at a dwelling or occupied building after he pulled the trigger on the gun and sent the first of at least eight bullets into Sturgeon's front door. Further, Defendant's "negligent use of a firearm" continued after he shot the front door because he was carrying his gun while inside Sturgeon's house. True, while Defendant was shooting at the front door he was also negligently using a firearm because he was carrying his gun while intoxicated, but overlapping conduct does not make the conduct unitary. Only if conduct were to overlap to the point where the acts were without "sufficient indicia of distinctness" would such conduct be unitary. *Begaye*, 2023-NMSC-015, ¶ 20 (internal quotation marks and citation omitted). Here, that was not the case because instances of Defendant carrying his gun while intoxicated occurred distinctly both before and after he shot at Sturgeon's front door.

{50}    Thus, based on the elements of the charged offenses and the facts presented at trial, the conduct was not unitary. Because the conduct was not unitary, double

33

jeopardy was not violated, and we need not analyze whether the Legislature intended multiple punishments. Defendant's convictions for shooting at a dwelling or occupied building and negligent use of a deadly weapon are affirmed.

## C. Firearm Enhancement

### 1. Factual overview

{51}    This incident occurred December 11, 2021. At that time, the pertinent part of Section 31-18-16 (2020) read as follows:

> A.    When a separate finding of fact by the court or jury shows that a firearm was *brandished* in the commission of a noncapital felony, the basic sentence of imprisonment prescribed for the offense in Section 31-18-15 NMSA 1978 shall be increased by three years.
>
> . . .
>
> D.    As used in this section, "brandished" means displaying or making a firearm known to another person while the firearm is present on the person of the offending party with intent to intimidate or injure a person.

*Id.* (emphasis added).

{52}    However, at trial the jury was given the following jury instruction, which followed UJI 14-6013 NMRA (2021):

> If you find the defendant guilty of second degree murder, attempt to commit a felony, to wit: first[-]degree murder (willful and deliberate), attempt to commit a felony, to wit: second[-]degree murder, aggravated assault with a deadly weapon or shooting at a dwelling or occupied building, then you must determine if the crimes were committed while the defendant *used* a firearm and report your determination. You must

34

> complete the special form to indicate your finding. With respect to any crime, for you to make a finding of "yes," the state must prove to your satisfaction beyond a reasonable doubt that crime was committed while the defendant *used* a firearm.

*See id.* (emphasis added) (setting forth an instruction on reaching a special verdict for use of a firearm).

{53}     Clearly, the UJI had not been updated to reflect the 2020 legislative change in the firearm enhancement statute, which changed enhanceable conduct from "use" to "brandish." *Compare* Section 31-18-16 (1993), *with* Section 31-18-16 (2020). The jury returned four special verdict forms finding "a firearm was used in the commission of" the first-degree murder of Aragon[4], the attempted first-degree murder of Sturgeon, the aggravated assault against Sturgeon, and while shooting at a dwelling or occupied building. Despite the jury's finding that a firearm was used in all three of the noncapital felonies committed by Defendant, the district court only enhanced Defendant's sentence for attempt to commit first-degree murder. Because the district court only applied the enhancement to the sentence for attempt to commit first-degree murder, we limit our analysis of this issue accordingly.

---

[4]*See* footnote 1, *supra*.

**2.** **The error on the jury instruction and special verdict form does not implicate a jurisdictional issue**

{54} As a preliminary matter, we address Defendant's argument that the district court lacked subject matter jurisdiction to impose an enhanced sentence. Defendant argues that because the district court's power to sentence is derived exclusively from statute, the district court had no statutory authority to impose the firearm enhancement because the jury did not make a finding that Defendant "brandished" a firearm during the commission of the attempted first-degree murder as required by Section 31-18-16(A) (2020). Thus, so the argument goes, the district court did not have subject matter jurisdiction to impose the enhanced sentence.

{55} We recognize that a court's sentencing power "is derived exclusively from statute," *State v. Martinez*, 1998-NMSC-023, ¶ 12, 126 N.M. 39, 966 P.2d 747, and that "a court's sentencing power properly is considered part of its subject matter jurisdiction." *State v. Tafoya*, 2010-NMSC-019, ¶ 7, 148 N.M. 391, 237 P.3d 693. Further, in many situations, and as our Court of Appeals has concluded, "[a] claim that a sentence is illegal and unauthorized by statute is jurisdictional." *State v. Wyman*, 2008-NMCA-113, ¶ 2, 144 N.M. 701, 191 P.3d 559.

{56} However, this Court has also held that an omitted element in a jury instruction does not implicate a jurisdictional issue. *See State v. Orosco*, 1992-NMSC-006, ¶ 7, 113 N.M. 780, 833 P.2d 1146. In arguing that an omitted element in a jury instruction

36

invokes a court's jurisdiction, the reasoning goes that (1) a court only has authority to impose a sentence by statute, (2) jury instructions list the elements as required by the statute, (3) an omitted element means the jury did not make a finding on it, (4) a lack of a jury finding means the statutory elements are unmet, and therefore (5) the court is without authority—that is, "jurisdiction"—to impose a sentence. *See State v. Southerland*, 1983-NMCA-131, ¶ 9, 100 N.M. 591, 673 P.2d 1324. In *Orosco*, we rejected this argument. 1992-NMSC-006, ¶ 7. There, we clarified that "'jurisdictional error' should be confined to instances in which the court was not competent to act," *id.*, and "by failing to instruct on an element of an offense, the trial court cannot really be said to have lost its competence to act in the matter." *Id.* ¶ 8. "Rather, the deficiency in the instructions constitutes error, and it is the task of an appellate court to determine whether the error so undermined the reliability of the conviction or prejudiced the defendant's rights as to require reversal." *Id.*

{57} Defendant's argument is therefore answered by *Orosco*. That this case involves a sentencing factor rather than an element of a charged offense is inconsequential. *See Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000) ("Any possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding."

37

(footnote omitted)). Additionally, we ascribe no significance to the fact that this case involves errors on a jury instruction *and* a special verdict form. Therefore, we conclude the error on the instruction and special verdict form is not jurisdictional, and automatic reversal is inappropriate. Instead, the deficiency in the instruction and special verdict form is an issue of instructional error, and we apply our rules and principles of error analysis accordingly.

**3.      Standard of review**

{58}      Defendant did not object to the instruction and special verdict form at trial. Consequently, this issue was not preserved, *see* Rule 12-321(A) NMRA, and so we review for fundamental error. *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633 (holding that unpreserved error in a jury instruction only warrants review for fundamental error).

**4.      The instruction and special verdict form for the firearm enhancement were erroneous**

{59}      In reviewing for fundamental error, we begin by asking "whether a reasonable juror would have been confused or misdirected by the instruction." *State v. Lucero*, 2017-NMSC-008, ¶ 27, 389 P.3d 1039 (internal quotation marks and citation omitted). Jury instructions cause confusion or misdirection when, "through omission or misstatement," they do not provide "an accurate rendition of the relevant law." *Benally*, 2001-NMSC-033, ¶ 12.

38

{60} Here, the firearm enhancement instruction and special verdict form did not give an accurate rendition of the factual finding required by law. "Brandished" is statutorily defined as "displaying or making a firearm known to another person while the firearm is present on the person of the offending party with intent to intimidate or injure a person." Section 31-18-16(D) (2020). This definition renders "brandished" narrower than the term "used," which means "to put into action or service: avail oneself of: employ." *Use*, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/use (last visited July 9, 2025); *see State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863 (stating that when words are not otherwise defined in a statute, we "giv[e] those words their ordinary meaning absent clear and express legislative intention to the contrary" (internal quotation marks and citation omitted)); *see also State v. Trujillo*, 1978-NMCA-041, ¶ 14, 91 N.M. 641, 578 P.2d 342 (holding that "'use' should be broadly construed"). Therefore, a person can use a firearm without brandishing it, even though a firearm could not be brandished without being used. *See Trujillo*, 1978-NMCA-041, ¶ 13 ("The display of [a] gun in a menacing manner . . . is certainly 'use' of the gun in the commonly accepted definition of that term." (internal quotation marks and citation omitted)). Because "brandished" is narrower than "used" and its specific statutory definition was not given to the jury in this case, we

conclude a reasonable juror would have been misdirected by the instruction. Therefore, the instruction and special verdict form were erroneous.

**5.      The error was not fundamental**

{61}      Because we conclude the instruction and special verdict form were erroneous, we move to step two, asking whether the error was fundamental. Fundamental error exists if it would "shock the [court's] conscience" to affirm the conviction, either because of "the obvious innocence of the defendant," or because "a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *Barber*, 2004-NMSC-019, ¶¶ 14, 16, 17. The scope of this analysis is broad: we "review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice." *Id.* ¶ 19 (internal quotation marks and citation omitted).

{62}      The "failure to instruct the jury on an essential element . . . ordinarily is fundamental error." *Id.* ¶ 20; *see Apprendi*, 530 U.S. at 490 (holding that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). However, not every failure to instruct on an essential element amounts to fundamental error. *Orosco*, 1992-NMSC-006, ¶ 17. There are two exceptions. First, failure to instruct on an

40

essential element is not fundamental error when the jury implicitly finds that the state has proven the omitted element. *Barber*, 2004-NMSC-019, ¶ 29 ("Error is not fundamental when the jury could not have reached its verdict without also finding the element omitted from the instructions."). This occurs when the jury makes a specific finding that—in the context of the facts and circumstances of the case— necessarily includes or amounts to a finding of the omitted element. *See Orosco*, 1992-NMSC-006, ¶ 19. Second, there is no fundamental error when the omitted element is "undisputed . . . and indisputable," such that any rational jury would have found the element to be true beyond a reasonable doubt if properly instructed. *State v. Padilla*, 1997-NMSC-022, ¶ 8, 123 N.M. 216, 937 P.2d 492. This second exception is narrow and will support affirmance only when proof of the omitted element is so strong that no rational jury could have failed to find that element and, even if the evidence is that strong, the missing element was not disputed or in issue at trial. *See Orosco*, 1992-NMSC-006, ¶ 10 (explaining that the court will look beyond the defendant's trial strategy to determine whether "any evidence or suggestion in the facts" could have put the omitted element in issue).

{63}     Here, the first exception applies, and so we need not reach the second. Given the elements of attempt to commit first-degree murder and the supporting facts introduced at trial, the jury implicitly found Defendant brandished a firearm when it

found him guilty of attempt to commit first-degree murder. To prove attempt to commit first-degree murder, the jury had to find beyond a reasonable doubt (1) Defendant intended to commit the crime of first-degree murder, and (2) he began to do an act which constituted a substantial part of the first-degree murder but failed to commit it. Per the prosecutor's closing argument, and as discussed in Part B, paragraph 43, *supra*, the attempt to commit first-degree murder occurred when Defendant "starts putting the bullets in the walls, and searching for [Sturgeon]." The evidence supporting this charge was Sturgeon's testimony that Defendant "shot the whole house up" and in the course of doing so "shot at" Sturgeon once while he was in the closet. Additionally, while Sturgeon was hiding in the closet, Defendant said, "I'm going to find you, too; I'll shoot you, too." And so, based on the elements of the charge and the facts used to prove them, the jury could not have found Defendant guilty of attempt to commit first-degree murder without also finding he brandished a firearm: Defendant *made his firearm known* to Sturgeon because Sturgeon himself testified to the fact that Defendant was shooting within the house and shot at Sturgeon once while he was in the closet; Defendant had the firearm *on his person* while squeezing its trigger because there is no other plausible way to fire a weapon; and Defendant harbored the *intent to injure* Sturgeon because the jury found Defendant had the intent to commit first-degree murder, which requires a deliberate

intent to kill. In sum, considering the elements and the facts presented at trial, Defendant's act of brandishing a firearm was subsumed by the requisite findings for attempt to commit first-degree murder. Accordingly, there was no fundamental error, and we affirm the firearm enhancement as imposed by the district court.

## III.  CONCLUSION

{64}    Defendant's convictions for first-degree murder, attempt to commit first-degree murder, aggravated assault, shooting at a dwelling or occupied building, and negligent use of a deadly weapon are affirmed. The district court's imposition of a three-year enhancement to the conviction for attempt to commit first-degree murder is also affirmed. We remand this case to the district court for imposition of a proper sentence for Defendant's conviction for negligent use of a deadly weapon, a petty misdemeanor limited to six months imprisonment.

{65}    **IT IS SO ORDERED.**

_____
**C. SHANNON BACON, Justice**

43

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**